IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DAMON J. WARE, | ) | Case No. 5:17cv2070 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff, Damon Ware, seeks judicial review of the final decision of the Commissioner of Social Security denying his application for supplemental security income under Title XVI of the Social Security Act ("Act").  The parties consented to my jurisdiction.  ECF Doc. 12.  Because the ALJ supported her decision with substantial evidence and because Ware has not identified any incorrect application of legal standards, the final decision of the Commissioner must be AFFIRMED.

## II.      Procedural History

Ware applied for supplemental security income on April 15, 2009.  (Tr. 122)  He alleged a disability onset date of September 14, 1998, but later amended the onset date to the date of his application.  (Tr. 122, 221)  His application was denied initially on July 29, 2009 (Tr. 79-81) and after reconsideration on November 10, 2009.  (Tr. 86-89)  Ware requested an administrative hearing (Tr. 48), and Administrative Law Judge ("ALJ") Dwight D. Wilkerson heard the case on

May 3, 2011.  (Tr. 50-76)  ALJ Wilkerson found Ware not disabled in an October 18, 2011

decision.  (Tr. 14-23)  Ware requested review of the hearing decision on October 25, 2011.  (Tr.

10)  On March 22, 2013, the Appeals Council denied review.  (Tr. 1-5)  Ware then appealed to

federal court.  The court found that the ALJ had failed to properly analyze the IQ score evidence.

The court vacated the ALJ's decision and remanded the claim on February 12, 2014.  (Tr. 514-

526)

On remand, ALJ Paula J. Goodrich held a second hearing on December 5, 2016 (Tr. 613-

659) and denied benefits in a decision dated July 15, 2015.  (Tr. 413-461)  The Appeals Council

denied Ware's request for further review on August 8, 2017, rendering the ALJ Goodrich's

conclusion the final decision of the Commissioner.  (Tr. 403-406)  Ware filed this administrative

appeal on October 30, 2017.  ECF Doc. 1.

## III.     Evidence

### A.     Personal, Educational and Vocational Evidence

Damon Ware applied for social security benefits when he was 19 years old.  (Tr. 122)  He

completed high school through a Life Skills program or special education classes.  (Tr. 55)  Ware

worked for short periods at a variety of different jobs, but none of them rose to the level of

substantial gainful activity.  (Tr. 420)

### B.     Relevant Medical Evidence

An evaluation team report ("ETR") was prepared when Ware was sixteen years old and

in high school.  Ware's high school psychologist, Dr. Richard Van Voorhis, reported that a

WISC-III from February 2001, when Ware was 12 years old, showed a verbal score of 78;

performance: 59; and full scale: 68.  Testing completed four years later in 2005 returned similar

scores:  verbal: 76; performance: 68; and full scale: 70.  The report indicated that Ware's

intellectual skills fell within the "developmental handicap/cognitive disability range." (Tr. 181) The report showed test results from another examination in 2007: word reading at 58 or grade equivalent of 3-6; numerical operations at 73 or grade equivalent of 5-5. (Tr. 182) Finally, the ETR showed test results from a WIAT-II test as: reading at 58/.3 percentile; and math level at 73/4th percentile. (Tr. 177) Members of the team agreed that Ware continued to have "significant weaknesses" in the areas of cognitive ability, academic achievement, and adaptive behavior. (Tr. 182)

When Ware was 17 years old, Canton City Schools conducted a multi-factored evaluation. (Tr. 190) Members of the team agreed that Ware continued to demonstrate significant weaknesses in the areas of cognitive ability, academic achievement, and adaptive behavior which adversely impacted his educational performance. Ware continued to meet the Ohio guidelines for cognitive disability eligibility. (Tr. 190)

Ware's individualized educational program was reviewed when he was 19 years old and in the 11th grade at Life Skills Centers. (Tr. 194) Compared to same-aged peers, his physical condition, motor skills, speech and language were average, but his intellectual, cognitive development and adaptive behavior were below average. (Tr. 194) He had failed all portions of the Ohio Graduation Test but was planning to re-take them until he passed or graduated. (Tr. 195)

In February 2009, Ware went to the emergency room after having been struck in the knee and head during an assault. Ware denied any ongoing major medical problems, but he reported smoking marijuana daily and drinking alcohol weekly. (Tr. 235)

In July 2009, Ware went to the emergency room with complaints of chest pain after smoking marijuana. He denied shortness of breath. (Tr. 239) Chest x-rays were unremarkable;

they showed mild hyperinflation and no acute pulmonary pathology.  (Tr. 241)  After receiving a breathing treatment, Ware was discharged with pain medication.  (Tr. 239)

On October 13, 2009, Ware overdosed on muscle relaxers.  He reported that he had been "partying" and was not attempting to commit suicide.  The ED report stated he was "given some charcoal" and discharged when he was no longer in distress.  (Tr. 242)

Ware began mental health treatment at Community Services of Stark County in October 2009.  He reported problems sleeping, depression, and learning disabilities.  (Tr. 323)  Ware denied any prior mental health treatment.  (Tr. 325)  He said he was fired from his last job after falling asleep on the first day.  (Tr. 324)  He reported having some friends and enjoying basketball and videogames.  (Tr. 328)  He said he was depressed "sometimes 5 out of 7 days since childhood" and worried about his condition, working, and going to school.  (Tr. 329)  He reported problems breathing while sleeping.  (Tr. 329)  Ware was diagnosed with a breathing related sleep disorder and a depression disorder.  (Tr. 332)

Ware returned to Community Services of Stark County on April 8, 2010.  He had not followed up with his medical doctor.  He was prescribed medication for relaxation and sleep issues.  (Tr. 316)  On May 6, 2010, Ware reported better sleep.  He was looking for employment but having a difficult time.  Ware was discharged from treatment at Community Services of Stark County in December 2010 because he had not shown up for multiple appointments.  (Tr. 305)

In February 2011, Ware went to the emergency room reporting a suicide attempt by overdosing on drugs and alcohol.  A toxicology screen showed marijuana use but no other drugs.  (Tr. 335)  He was diagnosed with adjustment disorder with mixed disturbance of emotions and conduct.  The discharge summary also stated: "rule out partial malingering."  (Tr. 359)  Notes

from this emergency room visit also stated that Ware was low risk for self-harm and appeared to be alleging a suicide attempt as a means to access mental health treatment and possibly disability. (Tr. 373)

On March 4, 2011, Ware visited Trillium Family Services. He reported feeling emotionally abused by his brother and kids at school. (Tr. 344) He stated that he had depression for a couple of years, anxiety around people, and sleep apnea. (Tr. 346, 348) He was sleeping two to three hours per night and had breathing problems while trying to fall asleep. (Tr. 348) He was not taking any medication at the time. (Tr. 344) He was trying to get social security or a job. (Tr. 349) He was diagnosed with an adjustment disorder and depressed mood. (Tr. 346)

Ware went to the emergency room on March 21, 2012, (Tr. 676-680) April 20, 2012, (Tr. 668-675) May 3, 2012, (Tr. 662-667) July 17, 2012, (Tr. 653-661) September 3, 2012, (Tr. 648-652) April 4, 2013, (Tr. 643-647) February 3, 2014, (Tr. 729-739) May 17, 2014, (Tr. 717-728) and June 16, 2014. (Tr. 701-716) Many of these visits were related to dehydration and bronchitis.

At an initial counseling session on December 1, 2014, Ware reported being depressed every day and having trouble breathing while sleeping. (Tr. 691) A close friend and two cousins had recently died. (Tr. 691) On December 8, 2014, Ware reported feeling stressed about Christmas because he couldn't buy any gifts for his family. (Tr. 686) he reported having had a panic attack the day before and getting very angry – screaming and throwing things. (Tr. 687)

On December 8, 2014, Ware established care with Dianne Kreptowski, D.O. He had an acute upper respiratory infection. He reported a history of asthma, sleep apnea and depression. (Tr. 695) Dr. Kreptowski listed Ware's diagnoses as acute bronchitis, asthma, and sleep apnea.

(Tr. 698-699)  However, on December 14, 2014, a pulmonary function study showed normal spirometry, normal lung volumes, and normal diffusion capacity.  (Tr. 693-694)

Ware went to Coleman Behavioral Health for an initial psychological evaluation on December 12, 2014.  (Tr. 681)  He reported issues with anger and depression.  Dr. Humayun Chughtai diagnosed intermittent explosive disorder, depressive disorder and an intellectual disability, and assigned a GAF score of 54.  (Tr. 683)

Ware saw Dr. Kreptowski on February 2, 2015.  He had an acute upper respiratory infection.  He reported asthma attacks once every few months.  (Tr. 778)

A sleep study in March 2015 showed severe obstructive sleep apnea.  Ware did "very well" with CPAP.  He had 97% sleep efficiency and much less fragmented sleep.  (Tr. 777)

### C.    Opinion Evidence

#### 1.    State Agency Reviewing Physicians

State agency reviewer, Alice Chambly, Psy.D., reviewed Ware's records and completed a Mental Residual Functional Capacity Assessment on July 20, 2009.  (Tr. 268-270)  Dr. Chambly determined that Ware had a learning disability that did not satisfy the criteria for an organic mental disorder under Listing 12.02.  (Tr. 273)  She also found that he did not meet the criteria for intellectual disability[1] under Listing 12.05, but that he had a borderline IQ.  (Tr. 276)  Dr. Chambly opined that Ware was moderately limited in his activities of daily living and in his ability to maintain concentration, persistence, and pace.  (Tr. 282)  She opined that he was moderately limited in his ability to maintain social functioning.  (Tr. 282)

Patricia Semmelman, Ph.D., reviewed Ware's records on October 23, 2009 and affirmed Dr. Chambly's opinions.  (Tr. 300)

---

[1] Dr. Chambly's report was on a form which used the now-outdated term "mental retardation."  In keeping with current law, this court utilizes the term intellectual disability.

### 2. Consultative Examination – Sylvester Huston, Ph.D., – June 2011

Sylvester Huston, Ph.D., examined Ware on June 9, 2011. (Tr. 385-391) Ware reported that he got "fired a lot" because of his sleep apnea and learning disabilities and that he could not maintain work. (Tr. 386) Ware reported that he had stopped drinking six months earlier and stopped smoking marijuana in 2009. (Tr. 387) Ware reported that he slept and watched T.V. during the day. He did not help with household chores. (Tr. 388) He said he slept well at night because he took cough medicine. (Tr. 389) Dr. Huston opined that Ware was functioning within the average range of intelligence, could maintain concentration, persistence and pace to perform simple tasks and multi-step tasks, but would have limitations in the ability to conform to social expectations in a work setting. He also opined that Ware would not respond appropriately to workplace pressure. (Tr. 391) Dr. Huston assigned three different global access functioning ("GAF") numbers: Symptom GAF: 51; Functioning GAF: 55; Overall GAF: 51. (Tr. 389)

### 3. Consultative Examination – James Lyall, Ph.D., – September 2011

James Lyall, Ph.D., performed a psychological examination on September 26, 2011. Dr. Lyall opined that, due to his intellectual problems and easy anger, Ware would have marked limitations in the functional areas of understanding and remembering complex work-related decisions, and responding appropriately to usual work situations. (Tr. 393-394) Dr. Lyall administered a WAIS-IV IQ test, and Ware's full scale IQ was 57. (Tr. 401) Dr. Lyall noted that Ware appeared to lack energy during testing and his overall IQ scores might be slightly higher, but even with full effort, Ware had difficulty doing many of the items during testing. (Tr. 399) Dr. Lyall diagnosed cognitive disorder and depressive disorder. He assigned a symptom GAF score of 60, functional GAF of 50, and overall GAF of 50. (Tr. 398-399) He noted that

Ware "may not be able to handle increasing levels of productivity or any more than simple directions and the directions would need to be repeated a number of times." (Tr. 400)

### 4. Consultative Examination – Kenneth Gruenfeld, Psy.D., – January 2015

Dr. Kenneth Gruenfeld conducted a psychological consultative examination on January 8, 2015. (Tr. 741-745) Ware exhibited depression by recent difficulty with sleeping, concentration, and motivation. He had difficulty with focus and self-esteem. (Tr. 743) Dr. Gruenfeld noted that Ware's grammatical structure and vocabulary suggested intellectual functioning in the extremely low range. He diagnosed depressive disorder and rule out borderline intellectual functioning. (Tr. 744) Dr. Gruenfeld opined that Ware could perform simple routine work without strict production requirements and with extra time to learn new tasks. He recognized that Ware had difficulty maintaining employment, but opined that Ware would be able to work in a low stress job. (Tr. 745)

### 5. Consultative Examination – Dr. Arsai Ahmad – January 2015

Ware underwent a physical consultative examination with Dr. Arsai Ahmad on January 14, 2015. (Tr. 746-751) Dr. Ahmad's examination returned mostly normal findings. He opined that Ware had slight impairments in walking and pushing/pulling due to his asthma and sleep apnea. He opined that Ware did not have any impairments in standing, sitting, bending, reaching, fine manipulation, repetitive foot movements, seeing, hearing, or speaking. (Tr. 750)

### D. Testimonial Evidence

### 1. Ware's Testimony

Ware lived in a house with his girlfriend. (Tr. 795) Ware graduated from high school through a Life Skills Program. (Tr. 796) He started a Stark State College program for cooking but was unable to complete one semester. (Tr. 798-799) In the past, Ware worked at restaurants

cooking and doing dishes but he had a hard time keeping up.  And, he did not like to work around many people.  (Tr. 843-844)

Ware had never learned to drive.  (Tr. 841)  He relied on his mother or girlfriend for transportation.  (Tr. 796)  He wouldn't ride the bus because he didn't like to be around a lot of people.  (Tr. 841)  His girlfriend helped him fill out job applications and go grocery shopping.  She also did the laundry and household chores.  (Tr. 803-804, 806)  Ware spent his days at home watching T.V.  (Tr. 804)  Sometimes, friends came over to play video games with him.  (Tr. 805)

Ware testified that he felt depressed.  He felt "down and out" about his IQ and his life in general.  He reported that he barely ate and that he cried when he was by himself.  (Tr. 842)

### 2.     Medical Expert Testimony

Dr. Mary Buban, Psy.D., a clinical psychologist,[2] testified at the hearing.  (Tr. 815-840)  Based on her review of Ware's records, Dr. Buban acknowledged that Ware had severe academic functioning deficits.  However, she did not feel that the record showed other adaptive functioning difficulties.  (Tr. 819, 823)  She noted that he lived independently.  (Tr. 819)  He did not have any social deficits.  (Tr. 823)

Dr. Buban opined that Ware's depression was not severe.  (Tr. 831, 834)  She did not believe that his depression would interfere with his ability to work or cause any limitations.  (Tr. 839)  She based her opinions regarding Ware's limitations upon his low IQ or cognitive functioning and other information she had learned from the record.  (Tr. 840)

### 3.     Vocational Expert Testimony

Vocational Expert Mary Harris ("VE") also testified at the hearing.  (Tr. 815-840)  The ALJ asked the VE to consider an individual with no exertional limitations who was limited to

_____

[2] Ware stipulated (Tr. 816) to the qualifications of the testifying expert, whose credentials are set forth in the record.  (Tr. 584-588)

simple, routine, and repetitive tasks that could be learned in 20 days or less. He could not work at a fast pace or have any strict time requirements or high production quotas. And he was limited to occasional interaction or contact with the public and could not perform tasks requiring close coordinated teamwork. The VE testified that such an individual could perform the jobs of mixing machine operator, cleaning positions, or laundry work. These jobs existed in significant numbers locally and nationally. (Tr. 848) The individual could still perform those jobs if his reading was limited to a third grade level; if he could do no tasks involving arbitration, negotiation, confrontation, directing the work of others, persuading others, or being responsible for the safety or welfare of others; and if he could not be exposed to pulmonary irritants. (Tr. 849-852)

When questioned by Ware's attorney, the VE testified that there would always be production requirement in jobs and an individual with no production requirements could not find employment. (Tr. 852) The VE also testified that a person could still do a cleaning job even if he needed to work alone and not around others. However, she lowered the number of available jobs for such an individual. (Tr. 853)

## IV.    The ALJ's July 15, 2015 Decision[3]

The relevant portions of the ALJ's decision (Tr. 416-461) are paraphrased as follows[4]:

1. Ware had not engaged in substantial gainful activity since April 15, 2009, the application date. (Tr. 420)

2. Ware had the following severe impairments: borderline intellectual functioning (or "BIF") and a learning disorder, diagnosed as cognitive disorder. (Tr. 421)

3. Ware did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part

---

[3] For purposes of this appeal, it is unnecessary to summarize the ALJ's October 2011 decision before remand.
[4] The court includes only those ALJ findings relevant to the issues Ware raises on appeal.

404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).  (Tr. 444)

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant number in the national economy that the claimant could perform.  (Tr. 459)

Based on her ten findings, the ALJ determined that Ware had not been under a disability since April 15, 2009, the date he filed his application.  (Tr. 460)

## V.    Law & Analysis

### A.    Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003); *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner may not be reversed just because the record contains substantial evidence to support a different conclusion.  *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."  *See Key v. Callahan,* 109 F.3d 270,

273 (6th Cir. 1997).  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without risking being second-guessed by a court.  *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

The court also must determine whether the ALJ decided the case using the correct legal standards.  If not, reversal is required unless the legal error was harmless.  *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

In considering an application for supplemental security income or for disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step One, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step

Two, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step Three, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step Four, the Commissioner determines whether the claimant can still perform his past relevant work; and finally, at Step Five, if it is established that claimant can no longer perform his past relevant work, the burden of proof shifts to the agency to establish whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Comm'r of Soc. Sec.,* 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920. Plaintiff bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits. 20 C.F.R. §404.1512(a).

### B.      Depression as Non-Severe Impairment

Ware's main contention is that the ALJ erred by not finding that he was disabled under the requirements of Listing 12.05(C). Ware argues that ALJ Goodrich failed to follow this court's remand order and erred by failing to recognize his depression as a severe impairment. ECF Doc. 13 at Page ID# 862-865. This court remanded the October 2011 ALJ decision because the ALJ inadequately analyzed the various IQ scores in the record. ECF Doc. 19 at Page ID# 513-515. On remand, ALJ Goodrich fully analyzed the IQ scores and, in fact, determined that the IQ scores met the first criteria for Listing 12.05(C): having a valid performance or full scale IQ between 60 and 70. (Tr. 449) However, Ware complains that ALJ Goodrich failed to follow the remand order by failing to recognize his depression as a severe impairment. ALJ Wilkerson's 2011 decision included depression as a severe impairment – but this court's remand order did not evaluate the severity of Ware's depression. To the contrary, the court stated that it declined to consider whether Ware's depression resulted in an "additional and significant work-

related limitation of function" for purposes of Listing 12.05(C). (Tr. 520-521) ALJ Goodrich followed the remand order by adequately analyzing the IQ scores in the record. Whether she erred in finding Ware's depression to be a non-severe impairment is unrelated to this court's remand order.

Ware argues that the ALJ erred in adopting Dr. Buban's opinion[5] that his depression was a non-severe impairment. Ware contends that Dr. Buban did not follow correct legal standard (the Social Security Administration standard at Step Two of the sequential analysis). Ware asserts that his depression was severe because it was more than a "slight abnormality . . . which would have no more than a minimal effect" on his ability to work. Social Security Ruling 85-28; *Halcomb v. Brown,* 819 F.2d 289, *3 (6th Cir. 1987).

The regulations provide that findings of no limitations or only mild limitations generally result in a limitation being found to be non-severe. 20 C.F.R. § 404.1520a(d)(1). ("If we rate the degrees of your limitation as "none" or "mild," we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities.") *Atterberry v. Sec'y of Health & Human Servs.,* 871 F.2d 567, 572 (6th Cir. 1989) (Record as a whole and a finding that claimant was "somewhat or mildly depressed" showed that claimant did not have a severe mental impairment.); *Carrelli v. Comm'r of Soc. Sec.,* 390 F. App'x 429, 435-436 (6th Cir. 2010) (non-severe mental impairment despite moderate limitations.) An impairment is not considered severe

---

[5] In his brief on the merits, Ware complains that the Commissioner did not file a complete transcript and that some of Dr. Buban's testimony was missing from the record. ECF Doc. 13. But, on May 21, 2018, the Commissioner filed a supplemental transcript with Dr. Buban's full testimony. ECF Doc. 18. And Ware later filed a reply brief. The supplemental filing renders Ware's complaint about Dr. Buban's testimony moot.

when it "does not significantly limit [one's] physical or mental ability to do basic work activities." § 404.1521(a).

ALJ Goodrich thoroughly explained why she found that Ware's depression was not severe. She acknowledged that medical records indicated that Ware had a depressive disorder but noted that many of these findings relied on Ware's self-reports and/or were from "other" mental health professionals. (Tr. 432-433) The ALJ discussed Dr. Buban's testimony that the record lacked evidence establishing a longitudinal severity for depression. Dr. Buban also opined that Ware's depressive disorder did not significantly limit his ability to work. Dr. Buban instead cited Ware's low IQ as the cause of his work limitations. (Tr. 433-434)

ALJ Goodrich acknowledged that Dr. Buban seemed to apply a different severity level than the "*de minimis* framework" set by the regulations. (Tr. 433) Nonetheless, ALJ Goodrich explained that she was adopting Dr. Buban's non-severity opinion for Ware's depression:

> Based on the following section that discusses in detail the salient points of the mental treatment notes and consultative psychological evaluations, including assigned Global Assessment of Functioning ("GAF") scores, the argument is technically not incorrect, but Dr. Buban's definition goes beyond that definition properly to account for the additional requirement for establishing severity: duration. Her testimony received great weight for the reasons she cited – *i.e.*, her being the only acceptable medical source of record who had the full benefit of reviewing the entire record in comprehensive, chronological, and cohesive fashion and her expertise as a clinical psychologist (Ex. 15B) – but is further reliable because it is quite sound with the regulations at Sections 12.00B and 12.00D of the mental listings, especially regarding potentially considerable variances in the symptoms and limiting effects of *any* mental impairment over time, the consequent need for sufficient evidence to account for such variations in order to arrive at a determination of "severity over time," and the vital need for evidence over a sufficiently long period to establish impairment severity. As applied to this record, Dr. Buban's testimony is supported in that there is insufficient evidence of longitudinally supported symptomatology (because of changes in symptom clusters from 2009-2010 to 2011 and from 2011 to December 2014) or of any real courses of medications or treatment to gauge whether the claimant, as he clearly alleges, has had significant and ongoing limitations because of depression or anger not only for more than the minimum period of 12 continuous months but since April 2009 when he filed his

application, or whether his symptoms have been less frequent and less persistent than alleged.

Thus, with great weight given to the testified opinion of Dr. Buban, the undersigned found in the foregoing review of the documentary medical (and some other non-medical) evidence of record that the treatment has been too sporadic and limited to sufficiently support a finding that he has had any ongoing and "significant" limitations in work-related functional abilities for any continuous period up to the six-plus year period dating back to his application date; and that, for multiple reasons, his allegations in favor of that continuing level of severe depression cannot be found generally credible to overcome the obstacle of the limited medical evidence and essentially "bridge" the isolated evaluations in the treatment setting and three consultative psychological evaluations to sufficiently support durational severity.

(Tr. 433-434)

ALJ Goodrich then proceeded to analyze Ware's medical records in detail to determine whether they demonstrated his depression was a severe impairment. (Tr. 434-440) She noted numerous records in which Ware made no mention of any depression. (Tr. 434-435) She analyzed Ware's alleged overdose in February 2011, noting that the records contained comments that Ware "feigned" his suicide attempt to obtain SSI benefits. (Tr. 436) ALJ Goodrich also cited large gaps in Ware's treatment for depressive symptoms. (Tr. 437-438) She noted that he often failed to follow-up with treatment. (Tr. 438-439) And many of Ware's depressive symptoms were gleaned from Ware's subjective reporting rather than from clinical indicators. (Tr. 439-440) The ALJ also cited record evidence suggesting that Ware's reporting was not fully credible. (Tr. 440) Substantial evidence supported the ALJ's finding that Ware's depressive symptoms did not significantly limit his physical or mental ability to do basic work activities, and she built a logical bridge between her decision and the record evidence. ALJ Goodrich's Step Two finding that Ware's depression was not a severe impairment was supported by substantial evidence and must be affirmed.

## C.    Listing 12.05

Ware also argues that ALJ Goodrich "disregarded" the IQ tests in the record.  ECF Doc. 13 at Page ID# 864-865.  This is incorrect.  The ALJ not only considered the IQ tests in the record but also concluded – in Ware's favor – that his low IQ scores satisfied the first prong of the criteria for Listing 12.05(C).  (Tr. 449)  However, she determined that he did not meet the other requirements of Listing 12.05(C).

A claimant's impairment must meet every element of a Listing before the Commissioner may conclude that he is disabled at Step Three.  20 C.F.R. § 404.1520; *see also Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001) ("A claimant must demonstrate that her impairment satisfies the diagnostic description for the listed impairment in order to be found disabled thereunder."); *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir.1986).  The claimant has the burden to prove that all of the elements are satisfied.  *King v. Sec'y of Health & Human Servs.*, 742 F.2d 968, 974 (6th Cir.1984).  "The burden of providing a . . . record . . . complete and detailed enough to enable the Secretary to make a disability determination rests with the claimant." *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir.1986).  The court may look to the ALJ's decision in its entirety to justify the ALJ's Step Three analysis.  *See Snoke v. Astrue*, 10-cv-1178, 2012 U.S. Dist. LEXIS 21930, 2012 WL 568986, at *6 (citing *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006)).  It is not sufficient to come close to meeting the conditions of a listing.  *See, e.g., Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir.1989) (Commissioner's decision affirmed where medical evidence "almost establishes a disability" under listing).  In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for her decision.  *See Keyes v. Astrue*, 1:11-cv-00312, 2012 WL 832576, at * 5–6 (N.D. Ohio March 12, 2012); *Reynolds*, 2011 WL 1228165, at * 4–5; *Marok v.*

*Astrue*, 5:08CV1832, 2010 WL 2294056, at *3 (N.D. Ohio Jun.3, 2010).

At the time of ALJ Goodrich's July 2015 decision,[6] Listing 12.05 provided, in relevant

part:

> 12.05 Intellectual disability: Intellectual disability refers to significantly
> subaverage general intellectual functioning with deficits in adaptive functioning
> initially manifested during the developmental period; i.e., the evidence
> demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A,
> B, C, or D are satisfied.
>
> A. Mental incapacity evidenced by dependence upon others for personal needs
>    (e.g., toileting, eating, dressing, or bathing) and inability to follow directions,
>    such that the use of standardized measures of intellectual functioning is
>    precluded;
>
> B. A valid verbal, performance, or full scale IQ of 59 or less;
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or
>    other mental impairment imposing an additional and significant work-related
>    limitation of function; or
>
> D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in two of the
>    following:
>
>> 1. Marked restriction of activities of daily living; or
>>
>> 2. Marked difficulties in maintaining social functioning; or
>>
>> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
>>
>> 4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1. "Under each [intellectual disability] listing, including

Listing 12.05(C), a claimant must establish that [his] impairment: satisfies the 'diagnostic

description in the introductory paragraph *and* any one of the four sets of criteria.'" *Oddo v.*

---

[6] The Social Security Administration revised the criteria in the Listing of Impairments that are used to
evaluate claims involving mental disorders in adults under titles II and XVI of the Social Security Act,
and the new rules became effective on January 17, 2017. *See* Revised Medical Criteria for Evaluating
Mental Disorders, 81 Fed. Reg. 66137, 66138 (Sept. 26, 2016) (codified at 20 C.F.R. §§ 404 and 416).

*Astrue*, No. 5:12-CV-00532, 2012 WL 7017622, *3 (N.D. Ohio Dec. 10, 2012) (quoting 20

C.F.R. pt. 404, Subpt. P, App. 1, § 12.00(A)) (emphasis in original), *adopted by sub nom, Oddo*

*v. Comm'r of Soc. Sec.*, No. 5:12 CV 532, 2013 WL 486276 (N.D. Ohio Feb. 6, 2013); *see also*

*Foster v. Halter*, 279 F.3d at 354.

ALJ Goodrich considered, in detail, each section of Listing 12.05. (Tr. 445-449) Ware

argues that he met the criteria for subsection C of Listing 12.05. ECF Doc. 13 at Page ID# 865-

866. He asserts that he had several diagnoses that imposed a significant work-related limitation

of function: adjustment disorder, depressive disorder, asthma, and sleep apnea. ECF Doc. 13 at

Page ID# 866. Ware contends that "any of these diagnoses imposes a significant work-related

limitation of function because it limited his concentration, persistence and pace." Ware then

cites Dr. Lyall's report to support this contention. ECF Doc. 13 at Page ID# 866.

Dr. Lyall's opinion was but one of several medical opinions in the record. The ALJ was

not required to give it controlling weight. In fact, the ALJ noted that the clinical observations of

the medical sources were too conflicting to support a finding that Ware had marked difficulty in

his ability to maintain concentration, persistence and pace. (Tr. 447) And, the ALJ fully

explained her finding that Ware had only moderate limitations (not significant) in this area:

> With regard to concentration, persistence or pace, the claimant has moderate
> difficulties. In May 2009, he reported abilities to arrange transportation for
> himself and to take a local bus, to make correct change for a purchase, and to
> manage his money (Ex. 3E). Although at the remand hearing he flatly testified
> "no" when asked if he could read, the undersigned pointed out how that
> representation is inconsistent with demonstrated reading and writing ability in
> school records (Ex. 14E/8), which produced his amended statement that he can
> engage in only "basic" reading but has not tried to read newspapers or magazines.
> While not inconsistent with his May 2011 testimony that he can read books at
> only a 1st grade level, the testimony conflicts with his actual reading level
> demonstrated on 2007 psychoeducational testing (*see* Ex. 14E/6) and with his
> statement that he reads the Bible (Ex. 12F/11). He does consistently state that he
> needs assistance filling out job applications, which he appears to have
> continuously done throughout the alleged period of disability.

(Tr. 446-447)

To show that his impairment met subsection C of Listing 12.05, Ware was required to show that he had: "(1) a valid verbal, performance, or full scale IQ of 60 to 70; and (2) another physical or mental impairment imposing an additional and significant work-related limitation of function." *Peterson v. Comm'r of Soc. Sec.*, 552 F. App'x 533, 539 (6th Cir. 2014) (citing 20 C.F.R. Pt. 404, Subpt. P, App'x 1, §§ 12.00A, 12.05(C). In her Step Three analysis, ALJ Goodrich found that Ware met the first prong of this listing, but not the second. Ware argues that he did meet the second prong, but other than citing Dr. Lyall's report, he has not cited other record evidence to support this argument. On the other hand, substantial evidence supported the ALJ's determination that he did not meet the second prong of Listing 12.05(C). ALJ Goodrich provided one of the most comprehensive discussions of a claimant's various medical conditions and impairments this court has seen in concluding Ware did not have a physical or other mental impairment imposing an additional and significant work-related limitation of function. In doing so, ALJ Goodrich built a logical and accurate bridge between the evidence and her determination. The ALJ's Step Three finding must be affirmed.

### D. Treatment of Medical Source Opinions

Ware argues that the ALJ failed to assign appropriate weight to the examining psychologists. ECF Doc. 13 at Page ID# 867-869. Specifically, he contends that she assigned too little weight to the opinions of Dr. Lyall and Dr. Gruenfeld and too much weight to Dr. Buban. Id. The administrative regulations implementing the Social Security Act impose standards on the weighing of medical source evidence. *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). In determining disability, an ALJ evaluates the opinions of medical sources in accordance with the nature of the work performed by the source. *Gayheart v. Comm'r of Soc.*

*Sec.,* 710 F.3d 365, 375 (6th Cir. 2013).  The Code of Federal Regulations describes how medical opinions must be weighed:

> (c)  How we weigh medical opinions.  Regardless of its source, we will evaluate every medical opinion we receive.  Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> > (1) Examining relationship.  Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
> >
> > (2) Treatment relationship.  Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. ...
> >
> > (3) Supportability.  The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion . . . .
> >
> > (4) Consistency.  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.
> >
> > (5) Specialization.  We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.
>
> . . .

20 CFR § 416.927(c).  See also 20 CFR § 404.1527(c).

In this case, there were no treating source opinions. Ware underwent consulting examinations with three different psychologists: Dr. Huston, Dr. Lyall and Dr. Gruenfeld. Ware does not raise any complaints about the ALJ's analysis of Dr. Huston's opinion. Regarding Dr. Lyall's opinion, Ware complains that the ALJ assigned weight to Dr. Lyall's opinions only to the extent they were consistent with Dr. Buban's testimony. In considering Dr. Lyall's opinions, the ALJ stated:

> The second examining psychologist Dr. James Lyall, offered a similar dual opinion wherein he found "marked" limitations on the form in terms of understanding and implementing complex word tasks and in responding to changes in a routine work setting; moderate difficulties in understanding and making simple work-related decisions for simple instructions; and moderate difficulties interacting with supervisors, co-workers, and the public (Ex. 16F/1-3). However, his accompanying narrative opinion reveals that reliance in such significant degree of work-related social and other difficulties was based on the claimant's questionable efforts and performance on cognitive testing and on his subjective reports of considerable issues related with others, including frequent fighting, which are not generally credible with other reports in the record. (Ex. 16F/7). Dr. Lyall's opinion for marked difficulties in some work-related abilities and moderate difficulties throughout social functioning received little weight for those reasons of it lacking support beyond the subjective statements and the claimant's performance at his evaluation. Some weight, however, was given to the narrative opinion that the claimant may not be able to handle "increasing levels of productivity," or any more than simple directions to the extent it is consistent with the medical expert's testimony.

The ALJ did not completely reject Dr. Lyall's opinion, and she explained why she did not assign greater weight to his opinion. Dr. Lyall stated that Ware appeared "to lack energy during the testing situation and his overall IQ scores might be slightly higher, although even with full effort, a number of times during the testing session, he had difficulty doing many of the items." (Tr. 399) It also appears that many of Dr. Lyall's opinions were based on subjective reports from Ware, which the ALJ determined were not entirely credible based on other evidence in the record:

The claimant's own reports of symptoms just three months [after] Dr. Huston's evaluation otherwise are inconsistent, as was his cognitive testing at this evaluation where he could not recall any objects. The report of attending Trillium for a couple of months and a prescription for Zoloft is again unsupported by the record. The claimant presented with "easy anger" and a bad temper and even endorsed ongoing "fist fights" with others, the last of which had occurred a mere two weeks earlier; such symptoms were curiously not mentioned in the preceding treatment notes or at Dr. Huston's evaluation. Dr. Lyall commented that the claimant lacked energy and effort during the evaluation and intelligence testing. He diagnosed depression but stated that symptoms may improve "if his life situation improves" or if he enters mental health care. (Ex. 16F/7).

(Tr. 437) The ALJ reasoned that Ware's conflicting statements at Dr. Huston and Dr. Lyall's closely-occurring psychological evaluations were not entirely credible. And, because each of these psychologists met with Ware only once, neither of them had a longitudinal perspective that could have revealed the inconsistencies in Ware's statements. Thus, it was logical for the ALJ to assign less weight to their opinions. The consulting psychologists relied, in part, on Ware's subjective statements and the record demonstrated that his statements were not fully consistent with the medical record.

Ware also argues that the ALJ improperly assigned less than controlling weight to Dr. Gruenfeld and only credited his opinion to the extent that it was consistent with the opinions expressed by Dr. Buban. Dr. Gruenfeld was the third and final examining psychologist and he found that Ware was "employable" with moderate difficulties in understanding, remembering and carrying out detailed instructions, in maintaining regular attendance at a job, in making simple work-related decisions, in responding appropriately to changes in a work setting, in using public transportation and traveling independently, and in responding appropriately to criticism. (Tr. 457-458) The ALJ assigned significant, but less than full, weight to Dr. Gruenfeld's opinion. She explained her reasons for doing so. (Tr. 439-440, 457-458) Conversely, Ware does not explain how the weight assigned to Dr. Gruenfeld's opinion negatively impacted the

ALJ's decision. He only complains that ALJ Goodrich qualified the weight given to Gruenfeld's opinion by crediting it "to the extent it is consistent with the medical expert's testimony." ECF Doc. 13 at Page ID# 867.

The ALJ explained why she assigned great weight to Dr. Buban's opinions. (Tr. 433-434, 456) Unlike the other opinions in the record, including those of the examining psychologists, Dr. Buban "had the benefit of the entire medical, educational, and other evidentiary records through the date of the remand hearing and had the benefit of listening to the claimant's testimony." (Tr. 456) Dr. Buban was a clinical psychologist who was familiar with Social Security's program regulations. (Tr. 456) The ALJ also explained that Dr. Buban's opinions were well-supported by the medical and documentary evidence in the case. (Tr. 433-434, 456)

The ALJ did not err weighing the opinions of Ware's consulting psychologists. Ware saw three different consulting psychologists. Their opinions were inconsistent with one another and were based, in part, on Ware's own conflicting statements. Two of them examined Ware four years before ALJ Goodrich issued her decision. The most recent consulting psychologist concluded Ware was employable with certain limitations. The ALJ explained why she assigned great weight to the testifying medical expert, Dr. Buban. She was a clinical psychologist who had the benefit of reviewing the entire record and hearing Ware's testimony. Ware has failed to show that the ALJ improperly evaluated the medical opinions as required by the agency's regulations. The ALJ thoroughly explained the weight she assigned to each medical opinion, and the weight assigned was supported by substantial evidence in the record. Ware has failed to identify any incorrect application of legal standards in ALJ Goodrich's treatment of the medical opinions.

### E.     Credibility

Finally, Ware contends the ALJ erred in assessing his credibility.  He argues that ALJ Goodrich should not have considered his attempts to work when determining his credibility.  But, even if the ALJ improperly considered Ware's attempts to work, she provided numerous other reasons supporting her credibility assessment.

The ALJ cited several inconsistencies in Ware's statements.  At the first hearing, Ware testified that his girlfriend did all the shopping, cleaning, and cooking for him but, at the second hearing, he stated that he helped with some of those tasks.  Ware was working as some form of a cook when he cut his hand and had to go to the emergency room.  The ALJ found this evidence inconsistent with Ware's testimony that he was unable to cook meals.  Ware had a longstanding relationship with his girlfriend and had regular visits from friends to play X-Box and, occasionally, basketball.  The ALJ found this evidence inconsistent with Ware's testimony that he could not take the bus because he didn't like to be around people.  She also found this information to be inconsistent with statements he made to Dr. Lyall that he had no friends because of his temper and anger.  Ware testified that he had a very low (1st grade) reading ability, but the ALJ cited school records showing that his reading level was at mid-3rd grade level and evidence showing that Ware graduated from high school in a Life Skills program.  The record also showed inconsistent statements about Ware's use of marijuana and alcohol.  (Tr. 455)

It is for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including the claimant.  *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997); *Crum v. Sullivan*, 921 F.2d 642, 644 (6th Cir. 1990); *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524, 538 (6th Cir. 1981).  However, the ALJ is not free to make credibility determinations based solely upon an "intangible or intuitive notion about an individual's

credibility." Soc. Sec. Rul. 96-7p, 1996 WL 374186, at * 4. Rather, such determinations must find support in the record. Whenever a claimant's complaints regarding symptoms, or their intensity and persistence, are not supported by objective medical evidence, the ALJ must determine the claimant's credibility concerning his or her complaints "based on a consideration of the entire case record." *Rogers v. Comm'r of Soc. Sec.* 486 F.3d 234, 247 (6th Cir. 2007). The entire case record includes any medical signs and lab findings, the claimant's own complaints of symptoms, any information provided by the treating physicians and others, as well as any other relevant evidence contained in the record. The ALJ must scrutinize the consistency of the various items of information contained in the record. Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect. *Id.*

Social Security Ruling 96-7p also requires the ALJ to explain her credibility determination. It "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.* In other words, blanket assertions that the claimant is not believable are inadequate, as are credibility findings that are not consistent with the entire record and the weight of the relevant evidence. *Id.*

At several places in her decision, ALJ Goodrich discussed her credibility assessment. She cited specific records supporting her findings. (Tr. 426, 437, 440-441, 454-455) In his reply brief, Ware suggests that his inconsistent statements are a result of his low IQ. ECF Doc. 19 at Page ID# 990. By making this argument, Ware conceders that the record contains numerous inconsistent statements. His argument is not well taken. It is for the ALJ, and not the reviewing

court, to evaluate the credibility of witnesses, including the claimant. The ALJ's credibility assessment must be affirmed.

## VI. Conclusion

Substantial evidence supported the ALJ's findings that Ware's depression was not severe, and that his impairments did not meet or medically equal a listing. The ALJ also properly considered the consulting psychologists' medical opinions and Ware's credibility. Because the ALJ's decision was supported by substantial evidence and because Ware has not identified any incorrect application of legal standards, the final decision of the Commissioner is AFFIRMED.

IT IS SO ORDERED.

Dated: November 2, 2018

Thomas M. Parker
United States Magistrate Judge